In the Matter of a Petition for Investigation and Determination of an Appropriate Unit and Exclusive Representative HILL–MURRAY FEDERATION OF TEACHERS, ST. PAUL, MINNESOTA, Petitioner, Appellant,

v.

HILL–MURRAY HIGH SCHOOL, MAPLEWOOD, MINNESOTA, Respondent,

Paul W. Goldberg, Commissioner, Minnesota Bureau of Mediation Services, Petitioner, Appellant.

No. C3–90–2617.

Supreme Court of Minnesota.

July 24, 1992.

859

Roger A. Peterson, Ronald G. Marks, Peterson, Engberg & Peterson, Minneapolis, for Hill–Murray Federation of Teachers.

Hubert H. Humphrey, III, Atty. Gen., Andrea Mitau Kircher, Sp. Asst. Atty. Gen., St. Paul, for Paul W. Goldberg, Com'r, Minnesota Bureau of Mediation Services.

Paul J. Zech, Charles F. Bisanz, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, for respondent.

KEITH, Chief Justice.

The Minnesota Federation of Teachers, on behalf of certain lay employees of Hill–Murray High School, petitioned the Minnesota Bureau of Mediation Services (Bureau) for determination of an appropriate bargaining unit and certification as exclusive representative under the provisions of the Minnesota Labor Relations Act (MLRA or Act), Minn.Stat. § 179.01–.17 (1990). Hill–Murray High School (Hill–Murray) moved to dismiss the petition and asserted that Bureau jurisdiction would directly infringe upon their rights under both the federal and state constitutions. The Bureau denied the motion to dismiss the petition, determined a bargaining unit and ordered an election. The members of the bargaining unit voted in favor of representation and the Bureau certified the Minnesota Federation of Teachers as the exclusive representative. The court of appeals reversed the Bureau's decision holding that the state was prohibited by the religion clauses of the state and federal constitutions from applying the MLRA to a religiously affiliated high school. *Hill–Murray Fed'n of Teachers v. Hill–Murray High Sch.*, 471 N.W.2d 372 (Minn.App. 1991). We reverse.

I.

Hill–Murray High School was created by the 1971 merger of Hill High School for boys and Archbishop Murray Memorial High School for girls. The mission of Hill–Murray High School is "to provide a well-rounded quality education in a Christian context. The pursuit of excellence in all areas of learning and personal growth is integrated with a deepening faith in Christ's message for whole and effective living." Hill–Murray High School, Faculty and Staff Handbook, 1989–90 at 3. This mission is reflected in the activities and atmosphere of the school. The vast majority (80%–85%) of students and teachers are

Catholic although only teachers of religion are required to be Catholic. The school observes the Catholic seasons and holds at least one Mass per month which all students and teachers are expected to attend. The school operates a campus ministry and there is daily prayer in the classrooms. A religion department provides formal theology and religious instruction for the students. The students are required to take religion courses each trimester. The religion teachers are certified by the Archdiocese and may be removed from employment by the Archbishop. The Archbishop reviews and oversees the church doctrine that is taught at the school.

Hill–Murray is also a college preparatory secondary school at which students study mathematics, history, English, science, music, etc. and are able to participate in debate, theatre, student council, athletics, the Yearbook, Quiz Bowl, Homecoming, and in all the other myriad activities that make up the typical Minnesota high school experience. Hill–Murray is accredited by the North Central Association Commission on Schools in compliance with the requirements of the State Board of Education. The school receives public aid on behalf of the students for textbook subsidies, counseling, guidance, health services, and transportation.

The school is operated by the Hill–Murray Education Association, Inc. (Association) which leases the school premises from the St. Paul Priory. The Association is a non-profit corporation incorporated under the laws of Minnesota. Membership in the Association is composed of the parents and legal guardians of the children who are enrolled at the school. The Association is governed by a fifteen person Board of Education. The Board of Education consists of two persons appointed by the Archbishop, three persons appointed by the Prioress of the St. Paul Priory, the president of the Hill–Murray Fathers Club, the president of the Hill–Murray Mothers Club, six persons elected by a majority of the Association and two persons appointed by the majority of the Board of Education. The Board of Education has the final authority for school policy and also has responsibility for setting budgets, establishing salaries and appointing the superintendent.

The teachers are under contract with the administration of Hill–Murray. The removal of teachers from employment is subject to the provisions of these contracts. They are required to support the teachings of the Catholic Church with respect to faith, morals, and specific doctrines of the church. The Faculty and Staff Handbook outlines many of the school policies including the grievance procedures and non-salary conditions of employment. Hill–Murray has a voluntary grievance procedure to be used in the resolution of disputes. Under this procedure, the complainant negotiates first with the person with whom the complainant has a grievance. Unresolved grievances are referred up the chain of authority until they reach a Review Committee of the Board of Education. There is also a salary negotiating committee that consists of teachers, administrators, and members of the Board of Education. It is not a collective bargaining process and Hill–Murray is not formally bound to continue recognition of the committee. Non-salary conditions of employment, as defined in the Faculty and Staff Handbook, include a description of the basic duty day (five teaching periods and one prefecting period), sixth class teaching assignment, health insurance, retirement program and procedure, unemployment insurance, tenure policy, substitution compensation, school related damage or loss of personal property, and professional liability insurance.

In 1989 the Hill–Murray Federation of Teachers petitioned the Bureau for determination of an appropriate unit and certification as exclusive representative of certain lay employees. The Bureau conducts elections pursuant to the MLRA to determine whether employees wish to be represented by a labor organization for the purposes of collective bargaining regarding

rates of pay, wages, hours of employment and conditions of employment. *See* Minn. Stat. § 179.16 (1990). Once the Bureau has certified an exclusive representative for bargaining, it has no ongoing authority to require parties to negotiate or to order sanctions against the parties. Any unfair labor practice must be resolved in district court pursuant to Minn.Stat. § 179.14 (1990). The Bureau held hearings over the course of several days and ultimately issued an order determining a bargaining unit and directing an election. The bargaining unit was composed of teachers, counselors, and librarians, and excluded employees in supervisory positions, the teachers in the religion department, and the elementary school music teachers.[1] Eighteen of the twenty-seven members of the bargaining unit voted in favor of representation by the Minnesota Federation of Teachers. The Bureau certified the Minnesota Federation of Teachers as the exclusive representative. The Minnesota Federation of Teachers is a local union affiliated with the American Federation of Teachers and the AFL–CIO.

Hill–Murray raised constitutional objections to the Bureau's assertion of jurisdiction from the very beginning. The Bureau, while cognizant of the constitutional issues implicated by the application of the MLRA to Hill–Murray, appropriately declined to address the constitutional issues and specifically preserved them for consideration by the courts.

Hill–Murray appealed the Bureau's assertion of jurisdiction to the Minnesota Court of Appeals. The court of appeals reversed the Bureau's decision certifying the union as the exclusive representative on state and federal constitutional grounds. *Hill–Murray Fed'n of Teachers v. Hill–Murray High Sch.*, 471 N.W.2d 372 (Minn. App.1991). The Federation of Teachers and the State of Minnesota Bureau of Mediation Services petitioned this court for further review.

## II.

The issues before us are:

1. Does the Minnesota Labor Relations Act statutorily exclude religiously affiliated organizations, employers or employees from coverage?

2. Does the application of the Minnesota Labor Relations Act to Hill–Murray violate either the free exercise or establishment clause of the first amendment of the Federal Constitution?

3. Does the application of the Minnesota Labor Relations Act to Hill–Murray violate the freedom of conscience clause of the Minnesota Constitution?

4. If application of the Minnesota Labor Relations Act to Hill–Murray is not unconstitutional, does the record support the unit determination by the Bureau?

## III.

The question of whether lay employees of a church affiliated school may organize under the provisions of the MLRA is one of first impression in this court. The United States Supreme Court, in addressing essentially this issue, ruled that because Congress did not intend for the National Labor Relations Act (NLRA) to cover religious institutions that the National Labor Relations Board (NLRB) did not have jurisdiction over teachers in a church operated school. *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). The Supreme Court's reliance on statutory construction to resolve what they characterized as "difficult and sensitive questions" allowed them to avoid deciding the inherent constitutional questions. *Id.* at 507, 99 S.Ct. at 1322.

█ The MLRA, though similar to the NLRA, is not identical and this court is

---

1. The Bureau decided that it did not need to address the issue of cleric inclusion or exclusion as no individual whose voting eligibility was at issue at the hearings was a cleric. Clerics are prohibited by canonical law from joining labor unions.

free to construe our statute in accordance with our state laws and history. *Willmar Poultry Co. v. Jones*, 430 F.Supp. 573, 575 n. 2 (D.Minn.1977). The MLRA defines "employer" to include:

> [A]ll persons employing others and all persons acting in the interest of an employer, but does not include the state, or any political or governmental subdivision thereof, nor any person subject to the Federal Railway Labor Act, as amended from time to time, nor the state or any political or governmental subdivision thereof except when used in Section 179.-13.

Minn.Stat. § 179.01, subd. 3 (1990). The definition of "employees" under the MLRA includes "the accepted definition of the word * * * but does not include any individuals employed in agricultural labor or by a parent or spouse or in domestic service of any person at the person's own home." Minn.Stat. § 179.01, subd. 4 (1990).

■ Neither employers nor employees of a religiously affiliated association are expressly excluded in the MLRA. An analysis of the legislative history reveals that there was no consideration by either the Minnesota House or the Senate as to the application of the Act to church affiliated organizations and their employees. We have previously analyzed the coverage of the MLRA and held that those who are not specifically excluded by the legislature must be regarded as within the definitions. *Northwestern Hosp. v. Public Bldg. Serv. Employes' Union Local No. 113*, 208 Minn. 389, 393, 294 N.W. 215, 217 (1940) ("Since the legislature specified certain exemptions, the most practical inference is that all intended were mentioned."). The laws of statutory construction in Minnesota also support inclusion of Hill–Murray and its employees within the coverage of the Act. Minn.Stat. § 645.19 (1990) ("Exceptions expressed in a law shall be construed to exclude all others."). In light of the language of the Act, the absence of legislative intent to exclude religiously affiliated orga-

nizations, *stare decisis*, and the Minnesota rules of statutory construction, we conclude that Hill–Murray is covered by the MLRA unless constitutional limitations prohibit such coverage.

## IV.

The First Amendment of the United States Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *." U.S. Const. amend. I. These protections of religion were first applied to the states in 1940. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

The Supreme Court recently altered its free exercise analysis in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The *Smith* majority cast aside the previously utilized balancing test in favor of a more narrow analysis. The balancing test allowed a burden on the exercise of religion only if the state's interests outweighed the degree of impairment of free exercise rights. *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *see also Bob Jones Univ. v. United States*, 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983); *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Thomas v. Review Bd.*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). The *Smith* analysis holds that a generally applicable and otherwise valid regulatory law which was not intended to regulate religious conduct or belief and which incidentally burdens the free exercise of religion does not violate the free exercise clause of the first amendment. *Smith*, 494 U.S. at 878, 110 S.Ct. at 1599. *Smith* retained the compelling interest test for so called hybrid situations in which the regulatory law impacts the free exercise of religion and some other constitutionally protected interest. *Id.* at 881–82, 110 S.Ct. at 1601–02.

■ There is no dispute that the MLRA is a valid law of general applicabili-

ty and does not intend to regulate religious conduct or beliefs. Hill–Murray argues that the facts present a hybrid situation akin to that in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and that the compelling interest balancing test should be applied in lieu of *Smith*. We find no hybrid interest on the part of Hill–Murray and note that the rights of parents in the education of their children as outlined in *Yoder* are altogether different than the rights of a religiously affiliated employer with respect to the control of and authority over their lay employees.[2] We also find no basis for Hill–Murray's argument that *Smith* applies only to criminal laws. *See Vandiver v. Hardin County Bd. of Educ.*, 925 F.2d 927, 932 (6th Cir.1991); *Salvation Army v. Department of Community Affairs*, 919 F.2d 183, 194–95 (3d Cir.1990).

 In accordance with *Smith*, we hold that the right to free exercise of religion does not include the right to be free from neutral regulatory laws which regulate only secular activities within a church affiliated institution. The application of the MLRA to labor relations at Hill–Murray does not violate the free exercise clause of the Federal Constitution. To hold otherwise would, in the words of the United States Supreme Court, allow Hill–Murray to "become a law unto [itself]." *Smith*, 494 U.S. at 879, 110 S.Ct. at 1600 (citing *Reynolds v. U.S.*, 98 U.S. 145, 167, 25 L.Ed. 244 (1879)).

 The establishment clause is the second facet of first amendment analysis and prohibits the making of laws "respecting an establishment of religion." U.S. Const. amend. 1. We believe that the church-labor relations issues presented here are most appropriately analyzed under the free exercise clause and that the establishment clause challenge raised by Hill–Murray is actually a free exercise question. *See*

Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Colum.L.Rev. 1373, 1384 (1981) ("Regulation that burdens religion, enacted because of the government's general interest in regulation, is simply not establishment. Magic words like 'entanglement' can not make it so * * *. [C]ourts that have analyzed the church labor relations cases in establishment clause terms have invoked the wrong provision."). Nevertheless, we realize these issues are being analyzed under the establishment clause in some jurisdictions and for this reason we will consider the establishment clause. *See, e.g., NLRB v. Hanna Boys Ctr.*, 940 F.2d 1295 (9th Cir.1991) *cert. denied*, — U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Catholic High Sch. Ass'n of Archdiocese of N.Y. v. Culvert*, 753 F.2d 1161 (2d Cir.1985); *Volunteers of America–Minnesota–Bar None Boys Ranch v. NLRB*, 752 F.2d 345 (8th Cir. 1985) *cert. denied*, 472 U.S. 1028, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985).

 In order to be valid under the establishment clause, a governmental regulation must have a secular purpose, must neither inhibit nor advance religion in its primary effect, and must not foster excessive governmental entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971). There is no dispute that only the third prong is potentially implicated by the application of the MLRA to the labor relations of Hill–Murray. Hill–Murray argues that the certification of the union and the potential for a continuing relationship between Hill–Murray and the Bureau is excessive state entanglement.

 The United States Supreme Court has acknowledged that "total separation is not possible in an absolute sense [and s]ome relationship between government

---

**2.** Even if we did find a hybrid interest, under the compelling state interest balancing test, we conclude that the application of the MLRA is not unconstitutional. The balancing test analysis under the Minnesota Constitution is discussed in section V of this opinion.

and religious organizations is inevitable." *Id.* at 614, 91 S.Ct. at 2112 (citations omitted). Hill–Murray receives limited public funds, is incorporated under state laws, and is subject to governmental regulation of fire codes, zoning ordinances, and compulsory student attendance. In analyzing an excessive entanglement claim, the "character and purposes of the institutions that are benefited, the nature of the aid that the state provides, and the resulting relationship between the government and the religious authority" is scrutinized. *Id.* at 615, 91 S.Ct. at 2112.

The character and purpose of Hill–Murray are intertwined with the Catholic religion. Catholicism is a pervasive influence at the school and while it is not possible to resolve whether the secular education or the sectarian indoctrination is the primary mission of Hill–Murray's existence, it is possible to discern that the religious aspect of Hill–Murray is inseparable from its overall purpose. The nature of the activity that is mandated by the application of the MLRA is jurisdiction by the Bureau and the ensuing obligation of the parties to negotiate in good faith about wages, hours, and conditions of employment. The resulting relationship between the state and Hill–Murray is centered on the state's authority to certify a bargaining unit, chosen by the lay employees, and on the potential power of the state to appoint a mediator and to resolve unfair labor practices through the district courts.

We believe the level of state intervention is minimal. The court of appeals declared that "[t]he threshold act of union certification alters and impinges upon the religious character of Hill–Murray because the church is no longer the sole arbiter of religious issues." *Hill–Murray Fed'n. of Teachers,* 471 N.W.2d at 379 (citations omitted). We disagree. This potential entanglement does not include the potential for the state to mandate religious beliefs nor does it contemplate that the MLRA will force the parties to agree to specific terms. The "conclusion that the state is inevitably forced to become involved in all of these issues misconceives the State's role in that process. It is a fundamental tenet of the regulation of collective bargaining that government brings private parties to the bargaining table and then leaves them alone to work through their problems." *Catholic High Sch. Ass'n of Archdiocese of N.Y. v. Culvert,* 753 F.2d 1161, 1167 (2d Cir.1985).

▮ The obligation imposed upon Hill–Murray by the application of the MLRA is the duty to bargain about hours, wages, and working conditions. We decline to categorize this minimal responsibility as excessive entanglement. Allowing lay teachers, almost all of whom are Catholic, to bargain collectively will not alter or impinge upon the religious character of the school. The first amendment wall of separation between church and state does not prohibit limited governmental regulation of purely secular aspects of a church school's operation.

## V.

▮ The Minnesota Constitution provides:

> The right of every man to worship God according to the dictates of his conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any religious or ecclesiastical ministry, against his consent; nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state * * *.

Minn. Const. art. I, § 16. We have construed this provision of our constitution to afford greater protection for religious liberties against governmental action than the first amendment of the federal constitu-

tion. *State v. Hershberger*, 462 N.W.2d 393 (Minn.1990). Although neither of the parties raises the issue, we take note that Hill–Murray has "standing" to assert the constitutional protections of article I, Section 16. *See State v. Sports and Health Club, Inc.*, 370 N.W.2d 844, 850 (Minn. 1985) *appeal dismissed*, 478 U.S. 1015, 106 S.Ct. 3315, 92 L.Ed.2d 730 (1986). The constitutional protections afforded to "every man" extend also to churches and their educational institutions. People of many different religions often exercise their collective beliefs together in the shared faith of their church. It would be counterintuitive to deny extension of religious freedom to churches and their educational branches like Hill–Murray.

 Because the Minnesota freedom of conscience clause provides more protection than the Federal Constitution, we will not follow the United States Supreme Court's limited analysis and will retain the compelling state interest balancing test. This test has four prongs: whether the objector's belief is sincerely held; whether the state regulation burdens the exercise of religious beliefs; whether the state interest in the regulation is overriding or compelling; and whether the state regulation uses the least restrictive means. *Hershberger*, 462 N.W.2d at 398; *State v. Sports and Health Club*, 370 N.W.2d 844, 851 (Minn. 1985).

### 1. Sincerely Held Religious Belief

The education of children within a Catholic school system is a significant factor in the propagation of the Catholic faith. *See Lemon v. Kurtzman*, 403 U.S. 602, 615, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971). The issue, however, is not whether Catholic education is an integral element of the Catholic mission, but rather, whether application of the MLRA interferes with religious beliefs. We do not believe that Hill–Murray is arguing that the application of the MLRA will infringe on the rights of individual parents to educate their children in a religious school.

 It is not the province of the court to examine the reason of religious beliefs or to resolve purely religious disputes. *See Serbian & Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). It is, however, proper for the courts to inquire as to whether a belief is held in good faith. *In re Jenison*, 267 Minn. 136, 125 N.W.2d 588 (1963). With this caveat in mind, we take note that the Catholic Church has a long history of support for labor unions and the right of workers to organize for the purposes of collective bargaining.[3] We do not believe that Hill–Murray is arguing that recognition of labor unions is against Catholic doctrine. What Hill–Murray is essentially arguing is that the separation of church and state prohibits the state, via the Bureau, from telling Hill–Murray what to do vis-à-vis their employees. The separation of church and state is a constitutional liberty that is subject to balancing by compelling state interests; "the liberty of conscience * * * shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state." Minn. Const. art. I., § 16.

Because we believe judicial intervention into the determination and interpretation of religious beliefs warrants caution, we will recognize the presence of a sincerely held religious belief.

### 2. The Burden on the Exercise of Religious Beliefs

Hill–Murray argues that the application of the MLRA would result in significant

---

3. The Church fully supports the right of workers to form unions or other associations to secure their rights to fair wages and working conditions. This is a specific application of the more general right to associate. In the words of Pope John Paul II: "The experience of history teaches that organizations of this type are an indispensable element of social life, especially in modern life." National Conference of Catholic Bishops, *Economic Justice for All: Pastoral Letter on Catholic Social Teaching and the U.S. Economy* (Washington, D.C.1986) at 53.

interference with the school's religious autonomy that would compel the school to negotiate and compromise its doctrinal positions.

The MLRA requires the parties to endeavor in good faith to reach an agreement with respect to "rates of pay, rules or working conditions in any place of employment." Minn.Stat. § 179.06, subd. 1 (1990). Conditions of employment are not defined within the Act. Hill–Murray asserts that negotiations about conditions of employment will lead to negotiations about religion. This assertion is remote and an insufficient basis to exempt Hill–Murray from the regulatory laws of the state. Conditions of employment are specified in the more recently enacted Public Employment Labor Relations Act (PELRA). Minn. Stat. ch. 179A (1990). PERLA states, in relevant part:

> "Terms and conditions of employment" means the hours of employment, the compensation therefor including fringe benefits except retirement contributions or benefits other than employer payment of, or contributions to, premiums for group insurance coverage of retired employees or severance pay, and the employer's personnel policies affecting the working conditions of the employees. In the case of professional employees the term does not mean educational policies of a school district.

Minn.Stat. § 179A.03, subd. 19 (1990). Negotiable terms and conditions of employment are limited to exclude matters of inherent managerial policy. *See* Minn.Stat. § 179A.07, subd. 1.

We hold that matters of religious doctrine and practice at a religiously affiliated school are intrinsically inherent matters of managerial policy and therefore nonnegotiable. Terms and conditions of employment, such as those specified in PELRA and those specified in the Hill–Murray Faculty and Staff Handbook are not doctrinally related and are negotiable. Negotiations under the limits of the MLRA do not possess the tendency to undermine Hill–Murray's religious authority. Hill–Murray retains the power to hire employees who meet their religious expectations, to require compliance with religious doctrine, and to remove any person who fails to follow the religious standards set forth.

While Hill–Murray may have demonstrated that the application of the MLRA interferes with their authority as an employer, they have not established that this minimal interference excessively burdens their religious beliefs.

### 3. Compelling State Interests

Hill–Murray argues that the grievance procedure at the school sufficiently maintains industrial peace. One of the state's most compelling interests is to ensure the peace and safety of labor relations. The United States Supreme Court has stated:

> Experience has abundantly demonstrated that the recognition of the right of employees to self-organization and to have representatives of their own choosing for the purpose of collective bargaining is often an essential condition of industrial peace. Refusal to confer and negotiate has been one of the most prolific causes of strife. This is such an outstanding fact in the history of labor disturbances that it is a proper subject of judicial notice and requires no citation of instances.

*NLRB v. Jones and Laughlin Steel Corp.,* 301 U.S. 1, 42, 57 S.Ct. 615, 627, 81 L.Ed. 893 (1937).

We are conscious of the rationale inherent in labor relations acts and believe the legislature's intent was to institute a process that could resolve labor unrest in an orderly, efficient, and principled manner while protecting the interests of all parties involved, to the greatest extent possible. The process instituted by the state permits minimal state intervention; once the unit is certified, the parties are essentially left on their own.

In addition to protecting labor peace, the state has an interest in safeguarding the

rights of association. The right of employees to collectively organize is statutorily recognized in Minnesota. The MLRA states: "Employees shall have the right of self-organization and the right to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in lawful, concerted activities for the purpose of collective bargaining * * *." Minn.Stat. § 179.10, subd. 1 (1990). Workers in the private sector are also guaranteed a first amendment constitutional right "to assemble, to discuss and formulate plans for furthering their own self interest in jobs * * *." *Lincoln Fed. Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 531, 69 S.Ct. 251, 254, 93 L.Ed. 212 (1949).

We find that these goals are more than competing interests; they are overriding and compelling. The exercise of religion must not infringe on another's liberty; to do so is contrary to the construction of article I, section 16 of the Minnesota Constitution. The state's interests in promoting the peace and safety of industrial relations, the recognition of the statutory guarantees of collective association and bargaining, and the first amendment protection of the right of association outweigh the minimal infringement of Hill–Murray's exercise of religious beliefs.

### 4. Least Restrictive Alternatives

In the event it is possible to achieve these compelling interests through less restrictive, alternative means, article I, section 16 dictates the use of that alternative. *State v. Hershberger*, 462 N.W.2d at 399. Hill–Murray argues that the voluntary grievance procedure is a less restrictive alternative to mandatory good faith negotiations. The nature of the voluntary grievance procedure is just that—voluntary. The nature of collective bargaining is unique; other alternatives pale in comparison and remain unable to effectuate the strength of collective action. Collective bargaining allows the individual "David" to negotiate against the employer "Goliath."

■ We reiterate an earlier point that the valid subjects of negotiation are those purely secular conditions of employment such as those specified in PELRA and the Hill–Murray Faculty and Staff Handbook. Doctrinal and religious issues are matters of inherent managerial policy and are non-negotiable. We believe that explicitly limiting the items of negotiations to those specifically enumerated conditions of employment is the best way to achieve the purpose and spirit of the Minnesota Constitution, the legislative intent behind the authorization of collective bargaining, and the rights of association.

### VI.

■ Finally, Hill–Murray argues that because the court of appeals did not reach the issues related to unit determination, they are not now properly before this court. They further argue that even if the issues are properly before this court that the Bureau's unit determination was inappropriate. We disagree and conclude that the matter is properly before us and that the unit determination by the Bureau is supported by the record. The Bureau's order articulated the consideration for unit determination and noted:

> Because it is the union which is seeking to establish rights under the statute—and since the standard is "an" appropriate unit, rather than the "most" appropriate unit—when confronted with employer-union contentions over the boundaries of the appropriate unit, it is customary for administrative agencies to examine the proposals of the union first. It is only when the union's proposals are rejected as "inappropriate" that it becomes necessary to examine those presented by the employer.

*See also Morand Bros. Beverage Co. v. NLRB*, 91 N.L.R.B. 409, 418 (1950) ("There is nothing in the statute [NLRA] which requires that the unit for bargaining be the *only* appropriate unit, or the *ultimate* unit, or the *most* appropriate unit"); the Act requires only that the unit be "appropri-

ate.") *enforced,* 190 F.2d 576 (7th Cir.1951) (emphasis in original).

While all of the employees of Hill–Murray possess a mutual goal of fostering the religious development of the students with whom they come into contact, a review of the record indicates that the Bureau's unit determination was an appropriate unit.

Reversed.

COYNE, Justice (dissenting).

I respectfully dissent. I believe that for many parents the decision to enroll their children in religiously affiliated private schools is a matter of conscience; a decision that sometimes exacts considerable personal sacrifice. Without doubt the State of Minnesota has an interest in the application of the principles articulated in the Minnesota Labor Relations Act and in the availability of the collective bargaining process. Certainly, the rights to engage in collective bargaining and to be represented by an exclusive representative are important to workers and are deserving of governmental protection and encouragement. If, however, that interest collides with the constitutional guarantee of rights of conscience, it seems to me that the interest in the collective bargaining process must yield.

Article I, section 16 of the Minnesota Constitution provides in part:

The right of every man to worship God according to the dictates of his own conscience shall never be infringed; * * * nor shall any control of or interference with the rights of conscience be permitted * * * *

Despite this constitutional restriction on interference with the rights of conscience, the Bureau of Mediation Services exercised jurisdiction over Hill–Murray High School, a coeducational high school operated by the Catholic Archdiocese of St. Paul/Minneapolis, and mandated collective bargaining between Hill–Murray High School and Hill–Murray Federation of Teachers, which the Bureau designated as the exclusive representative of the teachers employed by the school. In so interjecting itself into the relationship between the school and its teachers, the Bureau has empowered the teachers, through their governmentally designated representative, to control or interfere with the rights of conscience by making the continued operation of the school prohibitively expensive.

Certainly, organized labor holds the power to force closure of the employer's enterprise by enforcing contractual demands which an employer cannot meet. When the enterprise in question is a commercial enterprise, it is only fitting that the collective work force which produces the product or performs the service which the employer markets should have such power. When, however, the enterprise is oriented to religion, not commerce, the power to force closure is the power to control or interfere with constitutionally protected rights of conscience. Here, it is the state, through the intervention of the Bureau of Mediation Service which has empowered the teachers.

This is not to say that the state's mandate to the school to enter into the collective bargaining process with the Federation has forced closure of the school or of any other religiously affiliated school. Neither is it to assert that closure is the inevitable result of the collective bargaining process. The teachers, through their exclusive representative, may elect never to exercise the power conferred upon them by the Bureau's decision. It is simply to recognize that the state, which has interjected itself into the matter by asserting jurisdiction, has empowered the Federation to control or interfere with rights of conscience in violation of article I, section 16 of the Minnesota Constitution. Accordingly, I would affirm the decision of the court of appeals.